UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

SUSAN VERMETTE

     v.                                                      Civil No. 1:24-cv-335-TSM
                                                          Opinion No. 2025 DNH 068

BOSTON MEDICAL CENTER CORP. and
BOSTON MEDICAL CENTER HEALTH PLAN, INC.
d/b/a WELL SENSE HEALTH PLAN (f/k/a BOSTON MEDICAL
CENTER HEALTHNET PLAN, INC.)

### ORDER ON DEFENDANTS' PARTIAL MOTION TO DISMISS COUNTS II AND III OF THE COMPLAINT

Susan Vermette ("Vermette") brings this employment discrimination action (Doc. No. 1-1) against her former employers, Boston Medical Center Corp. and Boston Medical Center Health Plan, Inc. (collectively, "BMC"). Vermette alleges that BMC engaged in religious discrimination, failed to accommodate her, and wrongfully terminated her employment. BMC moved to dismiss (Doc. No. 3) Count II (Retaliation) and Count III (Wrongful Discharge) of Vermette's complaint. Vermette objected (Doc. No. 10) to the dismissal of Count III but agreed that Count II should be dismissed. In light of Vermette's agreement, BMC's motion (Doc. No. 3) is granted with respect to Count II. For the reasons explained below, the motion is denied with respect to Count III.

### LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id. Although this standard does not impose "a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011)). The facts may be derived not only from the complaint, but also from "whatever documents are either annexed to it or fairly incorporated into it, and any relevant matters that are susceptible to judicial notice." Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005). Applying this standard to the instant case, the relevant facts are as follows.

## BACKGROUND

BMC employed Vermette as a clinical quality improvement manager from August 2014 until December 6, 2021, when BMC terminated her employment. Doc. No. 1-1 at ¶¶ 3, 8. She worked 100% remotely from April 2016 until her termination and performed her job well. Id. at ¶ 8. On August 19, 2021, during the COVID-19 pandemic, BMC issued a mandatory COVID-19 vaccination policy requiring employees to receive the COVID-19 vaccine by December 3, 2021, as a condition of continued employment. Id. at ¶ 13. The notice also informed employees that they had until November 5, 2021, to file for an exemption from the policy. Id.

Vermette objected to being "involuntarily vaccinated" for two separate reasons. Id. at ¶ 10. First, Vermette had "concerns" about the potential effects of the vaccine. Id. Vermette received a "Hep B vaccine" in the 1980s "and shortly thereafter developed facial palsy," which her doctor at the time stated was "more likely than not . . . caused by the . . . vaccine[.]" Id. at ¶

11. Based on her prior experience, and "family complications related to health[,]" Vermette was "reasonably concerned" about medical complications related to the COVID-19 vaccine. Id.

Second, as a Catholic, Vermette has a "deeply held sincere religious belief[ ]," which she believed precluded her from getting the COVID-19 vaccine. Id. at ¶ 10. In particular she believed "that the body she was provided, by her Maker, should not be experimented with by changing its genetic code." Id. at ¶ 46. She also believed, based on her own research, that the COVID-19 vaccine "had a high potential to change the recipient's DNA." Id.

### *First Request for a Religious Exemption*

On September 20, 2021, Vermette filed a request for a religious exemption to the vaccination policy through BMC's online portal. Id. at ¶ 15. In her exemption request, Vermette explained that she understood that the COVID-19 vaccine's development and research utilized aborted fetuses/cells, which was "morally and ethically wrong." Id. at ¶¶ 15-16. She further explained that her body was "the temple of the Holy Spirit." Id. at ¶ 16. Additionally, she provided an attestation of her religious beliefs from a religious leader, as requested on BMC's religious exemption form. Id. at ¶¶ 16, 47.

On October 13, 2021, BMC's Senior Director of Employee and Labor Relations, John Hickey ("Hickey"), denied Vermette's request for a religious exemption. Id. at ¶ 17. In connection with his denial, Hickey characterized Vermette's religious beliefs as a "passionate and 'personal'" objection, and directed her to reach out with any questions. Id. However, he failed to explain the basis for his decision to deny her request. See id. A week later, Vermette emailed Hickey requesting to discuss the denial further, but she received no response to her request. Id. at ¶ 18.

### *Discussion with BMC's Medical Director*

At some point after BMC announced its vaccination requirement, and upon the recommendation of Vermette's immediate supervisor, Ana Berridge ("Berridge"), Vermette called

BMC's medical director, Jessica Rubinstein ("Rubinstein"), to express her concerns regarding the COVID-19 vaccine. Id. at ¶ 20. Vermette explained to Rubinstein that she was refusing to get the vaccine due to religious and medical concerns. Id. Regarding her medical concerns, Vermette informed Rubinstein of her facial palsy diagnosis following her Hep. B vaccination in the 1980s. Id. She also disclosed her family's medical history of neuromuscular disease and her concern that the COVID-19 vaccine could pose a risk to her. Id. at ¶ 21. Rubinstein responded that the vaccine was "safe," that Vermette "should get it," and that Vermette's adverse reaction to a prior vaccine did not imply that she would react adversely to the COVID-19 vaccine. Id.

During their call, Vermette also asserted that she should not be subject to the vaccination policy's mandate because she worked exclusively remotely. Id. at ¶ 22. In response, Rubinstein stated that "people who stay home are known to have contracted" COVID-19. Id. at ¶ 22. Although Vermette asserts that her conversation with Rubinstein put BMC on notice of her need for a medical exemption, she never filed a formal request for a medical exemption because BMC's online portal required medical records, and Vermette did not possess the medical records reflecting her adverse reaction to the Hep. B vaccine. See id. at ¶ 24.

### *Second Request for a Religious Exemption*

On October 26, 2021, Vermette submitted a second request for a religious exemption directly to Hickey because she could not download the application from the portal. Id. at ¶ 19. Vermette's second application provided more information regarding her religious objections. Id. Specifically, Vermette explained in detail that "getting the vaccine, a product manufactured and/or developed through the use of aborted fetuses is a sin, and by getting the [COVID-19] vaccine, she would be willingly sinning and separating herself from proper fellowship with God." Id.

Although Vermette submitted her second exemption request to BMC on October 26, 2021, she did not receive any response to her request until November 12, 2021, when her direct

4

supervisor, Berridge, contacted BMC's Human Resources Department on Vermette's behalf. Id. at ¶ 26. Berridge informed Vermette that her second request for a religious exemption was denied. Id. On November 18, 2021, Vermette emailed Hickey to request a written copy of the second denial. Id. at ¶ 28. Hickey confirmed the second denial but did not provide a formal denial in writing. Id.

### *Termination of Vermette's Employment*

On November 19, 2021, BMC issued a letter to Vermette stating that she would be terminated if she was not vaccinated by December 3, 2021. Id. at ¶ 29. Four days later, on November 23, 2021, Hickey issued a formal letter denying both of Vermette's religious exemption applications. Id. at ¶ 30. In his letter, Hickey "incorrectly" stated that Vermette was "on a leave of absence." Id. Apparently, therefore, Hickey failed to recognize that Vermette worked remotely and would not pose a threat to others if she failed to obtain a COVID-19 vaccine. On December 3, 2021, BMC sent Vermette a termination letter, effective December 6, 2021, explaining that the company was terminating her employment due to her refusal to get vaccinated. Id. at ¶ 31.

Following her termination, Vermette filed a discrimination charge with the New Hampshire Commission for Human Rights ("NHCHR") on May 17, 2022. Id. at ¶ 6. The NHCHR issued a Notice of Right to Sue letter to Vermette on May 9, 2024. Id. at ¶ 7. Vermette then filed the instant Lawsuit in Rockingham County Superior Court on August 8, 2024, and BMC removed the action to this court. Doc. No. 1.

### DISCUSSION

Vermette's complaint includes three counts against BMC. Doc. No. 1-1. In Count I and II, she alleges that BMC violated NH RSA 354-A and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), by discriminating against her on the basis of her sincerely held religious beliefs (Count I) and retaliating against her based on her religion (Count II). Id. at ¶¶ 52-65. In

5

Count III, Vermette alleges that BMC wrongfully discharged her from her job. Id. at ¶¶ 66-82. BMC moves to dismiss Counts II and III. Doc. No. 3. Vermette concedes to the dismissal of Count II, but objects to the dismissal of Count III. Doc. No. 10. Accordingly, the motion to dismiss Count II is granted and this court confines its analysis to Count III, Vermette's claim for wrongful discharge against BMC.

## I. Elements of a Claim for Wrongful Discharge

To state a claim for wrongful discharge under New Hampshire law, a plaintiff must sufficiently allege: "(1) the employer terminated the [plaintiff's] employment out of bad faith, malice, or retaliation; and (2) the employer terminated the employment because the employee performed acts that public policy would encourage or because she refused to perform acts that public policy would condemn." Donovan v. S. New Hampshire Univ., 175 N.H. 489, 492 (2022). "The first prong focusses (sic) on the nature of the employer's actions, while the public policy prong pertains to the employee's acts." Gavin v. Liberty Mut. Grp., Inc., No. 11-cv-159-LM, 2012 WL 3839345, at *7 (D.N.H. Sept. 5, 2012) (alteration omitted) (quoting Duhy v. Concord Gen. Mut. Ins. Co., No. 1:08-cv-00192-JL, 2009 WL 1650024, at *10 (D.N.H. June 10, 2009)). BMC argues that Vermette's claim fails both prongs because she has not sufficiently alleged that her termination was motivated by bad faith, retaliation, or malice and because the complaint fails to articulate a cognizable public policy. Doc. No. 3-1 at pgs. 8-9.

## II. Whether Vermette Alleged the Elements of a Wrongful Discharge Claim

### A. Element One: Bad Faith, Malice or Retaliation

#### i. *Bad faith or malice*

BMC argues that the allegations do not establish that Vermette was terminated out of bad faith or malice because there are no facts: (1) showing that Vermette was "discharged for pursing policies condoned" by BMC; (2) demonstrating that BMC's stated reason for Vermette's

6

termination was false; or (3) suggesting that BMC treated Vermette differently from other similarly situated employees. Doc. No. 3-1 at pg. 8. In response, Vermette contends that "[b]ad faith and malice can be considered interchangeable" and that the complaint alleges sufficient facts to satisfy this element of her wrongful discharge claim. Doc. No. 10-1 at pg. 5. Specifically, Vermette argues the denial of her religious exemption, even though she was a remote worker, was an example of bad faith. Id. Furthermore, Vermette identifies her conversation with Rubinstein, BMC's medical director, where Rubinstein provided medical advice surrounding the vaccine as another example of bad faith. See id. at pg. 6.

"Under New Hampshire law, 'bad faith' is the equivalent of malice." Antonis v. Elecs. for Imaging, Inc., No. 07-cv-163-JL, 2008 WL 5083979, at *3 (D.N.H. Nov. 25, 2008). Bad faith or malice may be proved where "(i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001) (citing Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921-922 (1981)). Bad faith may also be established by looking at "the course of events surrounding an employee's discharge, 'the manner in which the plaintiff was discharged,' or shifting reasons for an employee's termination." Hidalgo-Semlek v. Hansa Med., Inc., 498 F.Supp.3d 236, 268 (D.N.H. 2020) (quoting Cloutier, 121 N.H. at 921).

The court is persuaded, at this stage in the case, that Vermette sufficiently alleged bad faith. Vermette was a remote worker for BMC since April 2016. Doc. No. 1-1 at ¶ 8. She applied for an exemption twice, and as pleaded, was denied relief without explanation or consideration of her remote status. See id. at ¶¶ 15-19, 26-30. Accepting these facts as true, and drawing all reasonable inferences in Vermette's favor, the court finds that defendants' denial, without explanation, of Vermette's exemption request, especially considering Vermette's remote worker status,

constitutes bad faith. See Haley, 657 F.3d at 46 ("we accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom *in the pleader's favor*") (emphasis added) (quoting Artuso, 637 F.3d at 5)). Therefore, the complaint satisfies the first element of Vermette's claim for wrongful discharge.

The court is unpersuaded, however, by Vermette's assertion that the conversation between herself and Rubinstein is evidence of bad faith and/or malice, which motivated BMC to terminate her employment. See Doc. 10-1 at pg. 6. Although Vermette shared her religious and medical concerns about the COVID-19 vaccine with Rubinstein, and Rubinstein encouraged vaccination, there are no allegations that Rubinstein was involved in and/or influenced BMC's decision to terminate Vermette. Because Vermette fails to demonstrate the existence of "a causal link between the dismissal and [Rubinstein's] improper motive[,]" she fails to state a claim based on Rubinstein's alleged conduct. See Antonis, 2008 WL 5083979, at *3.

  ii. *Retaliation*

Although the court concludes that Vermette sufficiently alleged bad faith to satisfy the first element of a wrongful termination claim, the court nevertheless addresses BMC's contention that the complaint is devoid of any facts demonstrating that Vermette was terminated out of retaliation.[1] To state a claim for retaliation, a plaintiff must allege that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." See Vera v. F.W. Webb Co., No. 23-cv-0198-SE, 2025 WL 603808, at *5, *8 (D.N.H. Feb. 25, 2025) (quoting Stratton v. Bentley Univ., 113 F.4th 25, 41-42 (1st Cir. 2024)) (applying the McDonnell-Douglas burden-shifting analysis associated with Title VII to determine

---

[1] BMC also suggests that Vermette abandoned her retaliation argument by voluntarily dismissing Count II, Retaliation. See Doc. No. 11 at pg. 2 n. 1. The court need not address this argument, however, given its conclusion that the complaint does not sufficiently allege retaliation as a motivating factor for the wrongful termination.

whether there was retaliation for purposes of a wrongful termination claim under New Hampshire law).

Assuming, without deciding, that Vermette satisfies the first two prongs of the analysis, "wholly absent from [her] complaint is any allegation that satisfies the third element of a retaliation claim: that her application for a religious exemption to the vaccination policy was the but-for cause of her termination." Zerveskes v. Wentworth-Douglass Hosp., No. 24-CV-025-SE-TSM, 2024 WL 4301375, at *6 (D.N.H. Sept. 26, 2024). Rather, she alleges that BMC imposed the vaccination policy on all employees and fired her when she refused to comply with the policy. See Doc. No. 1-1 at ¶¶ 13-14, 31, 70, 75-76. "Such an allegation fails to plead a plausible claim for retaliation." Zerveskes, 2024 WL 4301375, at *6 (citing cases).

Vermette argues that her termination was in retaliation for her rejection of Rubinstein's vaccination recommendation and "medical advice." Doc. No. 10-1 at pg. 6. As discussed previously in relation to bad faith, however, Vermette does not allege any facts linking Rubinstein's conduct to the termination decision. Therefore, the complaint fails to allege that Vermette's termination was motivated by retaliation.

B.  Public Policy

BMC argues that Count III should be dismissed "for the independent reason that the Complaint fails to allege Plaintiff's termination was contrary to a cognizable public policy." Doc. No. 3-1 at 9. "Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law[.]" Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992). A plaintiff "must articulate the precise public policy she believes would be advanced" by her act and "identify the source of that policy." Netska v. Hubbell, Inc., No. 22-cv-265-SM, 2023 WL 199340, at *4 (D.N.H. Jan. 17, 2023) (citing Leeds v. BAE Sys., 165 N.H. 376, 379 (2013)). "Simply

9

positing that it is conceivable that undefined public policy is promoted" by a plaintiff's act "is insufficient to support a wrongful termination claim[.]" Cabacoff v. Fedex Ground Package Sys., Inc., No. 23-cv-084-LM, 2024 WL 1558606, at *3 (D.N.H. Feb. 5, 2024), approved by 2024 WL 1554928 (D.N.H. Apr. 10, 2024). This court concludes that Vermette's allegations are sufficient to satisfy this element of her wrongful discharge claim.

In her complaint, Vermette alleges that BMC's COVID-19 vaccination policy violated the Food, Drug, and Cosmetic Act's ("FDCA") emergency use authorization ("EUA") provision, "which was in part based on the Nuremberg Code, and . . . precludes forcing humans to partake in experimental medical procedures without their informed consent." Doc. No. 1-1 at ¶ 12. Alternatively, Vermette argues that there is a prohibition on forced vaccination policies rooted in case law. Doc. No. 10-1 at pg. 8 (citing Doe #1 v. Rumsfeld, 297 F. Supp. 2d 119, 134-135 (D.D.C. 2003)). Vermette further argues that New Hampshire's party status in State of Missouri v. Biden, 571 F. Supp. 3d 1079 (E.D. Mo. 2021), which continued through the time frame relevant here, demonstrates an "official policy of the State of New Hampshire that healthcare workers should not be mandated to subject themselves to the [COVID-19] vaccine." Doc. No. 1-1 at ¶ 79; see Doc. No. 10-1 at pgs. 9-10. Finally, Vermette alleges that BMC's refusal to provide her with a faith-based accommodation constituted religious discrimination, in violation of statutory public policy under Title VII. See Doc. No. 1-1 at ¶¶ 53-59, 73-74, 76. BMC argues that none of these theories establish a "cognizable public policy" for the purpose of a wrongful discharge claim. See Doc. No. 3-1 at pgs. 9-14.

    i. *Violation of Nuremberg Code and/or EUA provision of the FDCA*

The court agrees that neither the Nuremberg Code nor the EUA provision of the FDCA provides a public policy basis for Vermette's wrongful discharge claim. As noted in similar cases in this court, "the Nuremberg Code has no applicability in a case involving a vaccination

requirement during the COVID-19 pandemic and it does not govern private employers like [BMC]." Zerveskes, 2024 WL 4301375 at *7 (citing McNeil v. Health Care & Rehab. Servs., No. 23-cv-2-AJ, slip op. at 8-9 (D.N.H. Apr. 17, 2023)). "Further, the EUA provision of the FDCA 'only has legal effect on a person who carries out an activity for which an authorization under this section is issued.'" Id. (quoting McNeil, slip op. at 10). Since Vermette does not allege that BMC employees directly administered COVID-19 vaccinations, the EUA cannot provide a public policy basis for her wrongful discharge claim. See id.

Further, Vermette's reliance on Doe #1 v. Rumsfeld is misplaced. Although that case involved a question of vaccination, the case arose in a military context and concerned a mandatory vaccine for service members. See Rumsfeld, 297 F. Supp. 2d at 122. Moreover, the public policy argument at issue in that case pertained to policies relating to military readiness and potential harm to soldiers. See id. at 134. Vermette's allegations address the vaccination of civilians in the private sector. See generally Doc. No. 1-1. The military and its history of vaccine policy or usage cannot be equated to the circumstances presented here. See Parker v. Levy, 417 U.S. 733, 743 (1974) (explaining that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian" (internal quotations and citations omitted)).

  ii. *State of Missouri v. Biden*

Although the court is not persuaded by Vermette's EUA related arguments, this conclusion does not mandate dismissal of her wrongful termination claim in its entirety. Vermette alleges that New Hampshire's participation in State of Missouri v. Biden, "where the State of New Hampshire was seeking, or had, a 'stay' precluding the federal government from enforcing the [COVID-19 vaccine] mandate on healthcare workers[,]" constitutes a cognizable public policy for purposes of a wrongful termination claim. Doc. No. 1-1 at ¶ 79 ("Thus, it was the official policy of the State of New Hampshire that healthcare workers should not be mandated to subject themselves to the

11

vaccine."). However, BMC argues that New Hampshire's involvement in that case "is not a source of law that creates any cognizable public policy" because the Supreme Court ultimately ruled, in Biden v. Missouri, 595 U.S. 87 (2022), "that the Department of Health and Human Services had statutory authority to enforce a rule requiring health care workers to be vaccinated against COVID-19." Doc. No. 3-1 at 13. Thus, according to BMC, "the Biden proceedings indicate that the federal government has a public policy favoring COVID-19 vaccinations." Id.

Although the Supreme Court ultimately upheld the vaccine mandate at issue in Biden, see Biden v. Missouri, 595 U.S. at 89, Vermette's point is that, at the time of her termination, New Hampshire's position was that a vaccine mandate for healthcare workers was improper. Viewed generously, these allegations could qualify as a cognizable public policy in New Hampshire and support Vermette's claim that BMC terminated her employment because "she refused to perform [an act] that public policy would condemn." See Donovan, 175 N.H. at 492.

### iii. *Religious discrimination*

Finally, Vermette alleges that on two separate occasions, she requested a religious exemption to the vaccination policy based on her sincerely held religious beliefs, and BMC denied both exemption requests without a substantive explanation or any analysis of whether permitting her to continue working remotely would pose an undue hardship to BMC. These facts are sufficient to meet the second prong of plaintiff's claim.

"Courts have held that allegations or evidence of discrimination in the workplace are sufficient to satisfy the public policy element of a wrongful discharge claim." McNeil, slip op. at 5-6 (citing cases); see Zerveskes, 2024 WL 4301375, at *7 (finding the denial of a religious exemption without explanation or accommodation with continued remote work could qualify as contrary to public policy). When Vermette applied for a religious exemption, she provided a detailed accounting of her religious beliefs. However, BMC denied her request without

12

explanation. See Doc. No. 1-1 at ¶¶ 16-19, 26, 28. Moreover, when Vermette asked for an opportunity to discuss the denial, BMC failed to respond. Id. at ¶ 18. The lack of meaningful discussion and failure to accommodate Vermette's religious beliefs could qualify as religious discrimination, which is contrary to public policy. See McNeil, slip op. at 6-7 (concluding that employer's rejection of plaintiff's religious exemption without explanation or meaningful discussion, and employer's failure to accommodate plaintiff's request for remote work status, could qualify as conduct contrary to public policy).

Because BMC has not shown that Vermette failed to allege a plausible public policy at this stage in the proceedings, her wrongful discharge claim will not be dismissed on this basis.

## CONCLUSION

For the foregoing reasons, BMC's partial motion to dismiss the complaint (Doc. No. 3) is granted with respect to Count II and denied with respect to Count III.

SO ORDERED.

_____
Talesha L. Saint-Marc
United States Magistrate Judge

May 29, 2025

cc: Counsel of Record